**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**MARK G. ANDERSON CONSULTANTS, INC.,**          Civil Action No. 1:20-cv-1536

                              **Plaintiff,**                    **COMPLAINT**

         **-against-**

**CITIGROUP TECHNOLOGY, INC.**

                              **Defendant.**

---

Plaintiff, Mark G. Anderson Consultants, Inc. ("MGAC" or "Plaintiff"), by and through its undersigned counsel, Nesenoff & Miltenberg LLP, as and for its Complaint against Defendant Citigroup Technology, Inc. ("Citi" or "Defendant"), collectively known as the "Parties", respectfully states and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, accounts stated, breach of the implied covenant of good faith and fair dealing, quantum meruit, unjust enrichment, and fraud, which stems from a contract for project management services between the Parties. From the onset of the engagement, Citi failed to remit payment for invoices, both for project management services rendered and expense reimbursement in conjunction with the aforementioned project management services, in a timely manner.

2.      Additionally, Citi failed to engage with MGAC in good faith and misrepresented their true intentions to never follow through on the terms of the contract. Citi terminated the contract for project management services in June 2018 with numerous unpaid MGAC invoices.

3.      To date, Citi has failed to pay MGAC for project management services rendered and expenses incurred in the facilitation of project management, in excess of $485,000.00.

## THE PARTIES

4.       Plaintiff Mark G. Anderson Consultants, Inc. d/b/a MGAC is a corporation organized under the laws of Washington, District of Columbia and is headquartered at 730 Eleventh Street, NW, Washington, District of Columbia 20001.

5.       Founded in 1996, MGAC is an innovative consulting firm that offers a wide variety of services, including international project and program management.

6.       Defendant Citigroup Technology Inc. is a corporation organized under the laws of the State of Delaware. Upon information and belief, Citi has a principal place of business in New York City, operating at 388 Greenwich Street, New York, New York 10013.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the Parties are of diverse citizenship and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

a.       The Parties are diverse, thus satisfying 28 U.S.C. § 1332 (a)(1), because Plaintiff is a citizen of Washington, D.C. and Defendant is a citizen of Delaware.

b.       The amount in controversy is, at minimum, $487,657.57, thus satisfying 28 U.S.C. § 1332(a).

8.       Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Citi conducts substantial business in New York, NY and both Parties agreed upon this venue, per § 20.2 of the Master Services Agreement (the "MSA"), which both Parties duly executed.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### I. CITI AWARDS MGAC THE "EAST COAST RETAIL" PROJECTS

9.      In April 2016, Citi extended a request for proposals ("RFP") to approximately fourteen (14) different firms, including MGAC, to provide project and cost management services across the North American ("NAM") portfolio for Citi.

10.      During the RFP process, MGAC engaged in good faith discussions with Citi.

11.      MGAC submitted a proposal in April 2016 and responded to multiple rounds of additional questions, technical interviews, and updated proposals.

12.      The aforementioned discussions took place between several individuals at Citi and MGAC, including: (i) Samantha Dorfman ("Ms. Dorfman"), Citi's Global Head of Retail Design and NAM Design Construction, and (ii) Mark G. Anderson ("Mr. Anderson"), President of MGAC.

13.      In early August 2016, MGAC received notice that Citi would award it the projects for which Citi extended the RFP, and that separate awards would be made for Retail Project Management, Office Project Management, and Cost Management.

14.      Citi awarded the "East Coast Retail" projects (the "Projects") to MGAC, which included the management and design of construction for new Citi locations and renovations up and down the east coast, with a primary focus in New York, New York and Miami, Florida.

15.      MGAC and Citi subsequently executed four documents that comprised the contracts between the Parties: (i) the Master Services Agreement ("MSA"); (ii) Work Order 1; (iii) Work Order 2; and (iv) Amendment 1 to the MSA (collectively "the Agreement").

## II. THE AGREEMENT

### A. The Master Services Agreement ("MSA")

16.     Defendant Citi formally engaged MGAC on August 12, 2016, conducted a "kick off" teleconference on Monday August 15, 2016, and subsequently issued a Notice to Proceed to MGAC on August 17, 2016.

17.     Mr. Anderson of MGAC executed the MSA on August 16, 2016. Mr. Christopher R. Stakelum executed the agreement on behalf Citi in his capacity as Director, on September 26, 2016, over a month after MGAC's execution of the MSA.

18.     The MSA bound MGAC and Citi for a term of three years, with several options to extend. *MSA*, § 2.1.

19.     The "Project," as defined by the MSA, encompassed "the particular project described on a Work Order," *MSA* at § 1.1. The MSA defined "Work Order" as "a written transactional document…signed by an authorized representative of each Party and entered into under this Agreement that describes the Services." *Id.*

20.     The MSA called for each project to be described on a separate work order and for Citi to remit payment to MGAC for services provided under each work order. *MSA* at §§ 2.2, 8.1.

21.     Citi and MGAC considered each work order a separate agreement that incorporated the MSA by reference. *MSA* at § 3.2.

22.     In the event of Citi's breach of a material obligation under a work order or the MSA, the MSA permitted MGAC to terminate the Agreement.

23.     Prior to termination, the MSA required MGAC to provide notice of any breach to Citi and allow Citi thirty (30) days to cure the breach. *MSA* at § 2.2.1.

24.    Conversely, the MSA permitted Citi to terminate for several reasons, including, "without cause, at any time, in its sole discretion by providing 60 days' prior written notice to Supplier." *MSA* at § 2.2.2.

25.    The MSA gave MGAC responsibility to "review and comment on cost plans, cost reports, and other financial information prepared by the Governance Compliance Office ("GCO")[1] or any other third party appointed to undertake cost estimating, management and reporting (collectively, "Cost Manager")." *Amendment 1*, App. F § 2.3.32.

26.    The MSA gave Citi responsibility for processing and approving specific and additional funding requests.

27.    The MSA detailed the expense reimbursement requirements, specifically, for Citi to reimburse MGAC "for expenses (including any pass-through charges) that: (i) are reasonable, warranted and cost-effective, (ii) have been approved in advance by Citi or any Citi-designated relationship manager or Project manager, and (iii) have been incurred in accordance with Citi's expense policies." *MSA* at § 8.4.1.

28.    Per the MSA, MGAC needed to submit receipts for which they sought reimbursement. *Id.*

29.    Citi required MGAC to submit invoices each month for project management services rendered.

30.    The MSA required Citi to remit payment within sixty (60) days of the date that the invoice was received, so long as the invoice was uncontested. *MSA* at § 8.5.

---

[1] The Governance Compliance Office ("GCO") functioned as an internal business unit operating within Citi's Real Estate department and staffed by external employees of global consultants, Turner and Townsend. The responsibilities of the GCO included administering and managing all aspects of project and cost management across Citi's portfolio of work. Additionally, the GCO reviewed and processed all contracts, invoices, and other project related documents on behalf of Citi and routinely provided direction to vendors on Citi's behalf.

31.     Citi agreed to endeavor to pay the invoices within thirty (30) days, and MGAC agreed to permit Citi to "deduct from the payment an early payment credit in the amount of one percent (1%) of the invoice" if paid within thirty (30) days. *Id*.

32.     The MSA also allowed for Citi to withhold payment "for any fees or charges…that Citi reasonably disputes." *MSA* at § 8.6.

33.     The MSA bound the Parties to engage in good faith discussion to reconcile any disputes and ***obligated*** Citi to pay any undisputed portions of the invoices. *Id.*

34.     Citi provided written notice for MGAC to proceed on August 17, 2016. MGAC immediately commenced work on the project even though Citi did not provide the executed MSA until over one month later.

35.     The MSA did not provide a budget per each project or maximum fee per project for project management services.

36.     The MSA also did not include a description of how project management fees (the cost of project manager services) would be capitalized, per each individual sub-project within the Projects.

## B. Work Order 1

37.     Citi and MGAC enacted the first work order of the project ("Work Order 1"), effective August 12, 2016. Mr. Anderson of MGAC executed Work Order 1 on September 28, 2016. John Sklet, Senior Vice President in Corporate Procurement, executed Work Order 1 on behalf of Citi on November 7, 2016, again, over one month after MGAC's execution of the document.

38.     Work Order 1 covered the period from August 17, 2016 to September 27, 2016 (the "Transition Phase"). It detailed the project managers for both Parties: Kathryn Eisenhower ("Ms. Eisenhower") for MGAC and Ms. Dorfman for Citi. *Work Order 1* at § 3.

39.     Work Order 1 contained the locations for the initial projects that Citi wanted MGAC to immediately start action on and included the following projects of high value and substantial undertaking, collectively known as "Package 1 – East Coast Retail":

      a.     Manhattan Branch Renovation: $35,000,000 refurbishment projects of high-profile branch;

      b.     North East Priority Branch Projects: approximately ten (10) high profile projects with outstanding issues (schedule problems, operational issues, etc.) which ranged in amount from $1,000,000 – $5,000,000, with two projects valued at $8,000,000 and $12,000,000, respectively;

      c.     North East New Branch Projects: fifteen (15) projects, ranging from renovation to total relocation in New York, Virginia, and Connecticut, with over ten (10) projects in New York, New York (Manhattan) alone, where Citi needed MGAC project managers to rapidly develop schedules and budgets;

      d.     Boca Raton, Florida Branch Relocation: $3,000,000 project in progress at the time of execution of Work Order 1, with a target completion date of year end of 2016; and

      e.     Weston Town Center, Florida Expansion: $1,500,000 project pending final approval, with a target completion date of year end of 2016.

*Work Order 1*, Exhibit A-1 §§ 2.9.1 - 2.9.5.

40.     Citi set a limit on project management services for the Transition Phase as described in Work Order 1 and imposed a "not to exceed" amount of $298,524.67, "unless mutually changed and agreed by Citi and [MGAC], which will be executed in writing through the Work Order process." *Work Order 1* at § 4(a).

41.     Work Order 1 did not include a separate budget for each individual project, unless identified above.

42.     Work Order 1 did not include Project Management fees for each project included in Work Order 1; rather, it included the total fees for all project management services during the Transition Phase for the "East Coast Retail" projects.

43.     Work Order 1 addressed other monetary sums and included a detailed table of rates for each MGAC personnel grade employee involved in Citi's projects, reproduced below:

| Supplier's Personnel Grades | Rate* per Hour USD |
|---|---|
| Account Manager | 197.98 |
| Senior Project Manager | 154.18 |
| Project Manager | 123.08 |
| Assistant Project Manager | 89.46 |
| Project Support | 67.41 |
| *Supplier's rates do not include travel and living expenses incurred by Supplier in conjunction with its provision of the Services. Such expenses shall be governed by Citi's expense policy included in Exhibit A-2. | |

*Work Order 1* at § 4(a)(ii).

44.     Work Order 1 required Citi to reimburse reasonable travel expenses that were compliant with Citi's Expense Management Policy. *Work Order 1* at Exhibit A-1 § 1.2. Version twenty (20) of Citi's Expense Management Policy included a PowerPoint presentation with the necessary information, with an effective date of January 7, 2016. Citi detailed numerous reimbursable business expenses in their Expense Management Policy, including, but not limited

to, hotels, airfare, train tickets, rental vehicles, meals, and internet charges, all incurred while travelling. *Work Order 1* at Exhibit A-2.

45.     Additionally, Work Order 1 required Citi to provide access and use of Citi's Systems to MGAC. *Work Order 1* at § 7.

46.     Work Order 1 also set forth additional requirements for the engagement. It required that MGAC meet regularly with Citi to discuss the Projects, prepare several monthly reports, provide a rapid team of project managers, and attend a two-day workshop in New York. *Work Order 1* at Exhibit A-1 §§ 2.2, 2.4, 2.7, 2.9, and 2.10.

47.     MGAC received a Purchase Order[2] for Work Order 1 on November 15, 2016.

### C. Amendment 1 to the MSA

48.     The Parties executed Amendment 1 to the MSA ("Amendment 1") on September 28, 2016.

49.     Amendment 1 added a new MGAC personnel grade to the personnel rates table: A Regional Manager, a person who is a "degree qualified Associate Partner/Director (with at least 10 years post-qualification experience)" and would provide "oversight to the regional delivery team of between 4-8 staff," at a rate of $175.00 per hour. *Amendment 1* at § 1.

50.     Additionally, Amendment 1 redefined "services" as "certain project management services as described in Appendix F to the Agreement that are to be provided by [MGAC] to Citi…and any related services, information, or materials to be provided by Supplier under this agreement." *Amendment 1* at, § 2.

---

[2] Citi used Purchase Orders to identify funding sources for invoices to be charged against. The internal document verified secured funding as purchased by Citi and detailed in the Agreement between Citi and their vendors. Additionally, the utilization of a purchase order and a contract is a typical process in this industry.

51.     Amendment 1 also addressed invoicing requirements. MGAC's invoices submitted to Citi needed to "be based on the number of hours worked by each resource in a monthly calendar period, and must be supported by a breakdown of hours by each resource, and where requested by Citi, by project and phase worked on by each resource." *Amendment 1* at App. F § 1.4

52.     Amendment 1 did not include a separate budget for each individual project, including project management services, encompassed in the "East Coast Retail" projects.

53.     Additionally, Amendment 1 did not include details on allocation of project management fees per project or capitalization by Citi.

### *D. Work Order 2*

54.     Defendant Citi and MGAC enacted the second work order of the project ("Work Order 2"), effective September 28, 2016, with a completion date of August 12, 2019, for the Projects.

55.     Mr. Anderson of MGAC executed Work Order 2 on November 29, 2016. A Director of Citi executed Work Order 2 on behalf of Defendant Citi on December 2, 2016.

56.     Work Order 2 identified the project managers for both Parties: again, Ms. Eisenhower for MGAC and Ms. Dorfman for Defendant Citi. *Work Order 2*, § 3.

57.     Work Order 2 required MGAC to charge for their project management services "on a time reimbursable hourly rate basis" in addition to a one-time lump sum for staff bonuses. *Work Order 2*, § 4(a).

58.     Citi imposed a spending limit on project management services, detailed in Work Order 2, specifically, a "not to exceed" amount of $6,667,469.81 for the first six months of the term. *Work Order 2* at § 4(a).

59.     Additionally, Work Order 2 required the Parties to recalculate and amend the maximum amount annually. *Id.*

60.     Work Order 2 did not include a separate budget for each individual project, including project management services, encompassed in the Projects.

61.     A detailed compensation calculation table for each individual MGAC employee involved in the engagement with Citi appears as Exhibit 1 to Work Order 2. It denoted fees by name, title, hourly rate, maximum hours, and total dollar amount. *Work Order 2* at Exhibit 1.

62.     Additionally, Work Order 2 noted that MGAC would require access and use of Citi's Systems. *Work Order 2* at § 7.

63.     The Purchase Order for Work Order 2 is dated December 14, 2016; however, MGAC did not receive the Purchase Order for Work Order 2 until January 4, 2017.

## III. PROCEDURES COMMON TO ALL PROJECTS

64.     Upon Citi's award of the RFP to MGAC, Citi requested on August 17, 2016, for MGAC to immediately commence work on the projects.

65.     MGAC sprang into action, despite the lack of an executed MSA.

66.     Citi retained a private global consultant group, Turner & Townsend, to serve as its GCO for the engagement between the Parties. At all times herein relevant, GCO served as an agent for Citi.

67.     Citi retained an additional consultant group, Linesight, to provide Cost Management services across all projects.

68.     The Amended MSA required MGAC to "review and comment on cost plans, cost reports, and other financial information prepared by the GCO or any other third party appointed to undertake cost estimating, management and reporting (collectively, 'Cost Manager')", and for Citi

11

to process and approve specific and additional funding requests, per MGAC and Linesight's recommendations. *Amendment 1* at App. F § 2.3.32.

69.     For funding requests, procedurally, the Project Manager worked with Citi, the GCO, and the Cost Manager to develop a plan, which Citi Corporate Real Estate approved prior to any information being entered into Citi's systems, which would then route it for approval.

70.     At the commencement of the Agreement in 2016, Citi used the Real Estate Management System ("REMS"), an online tracking system, to track project budgets, which Citi later converted to the Real Estate and Lease Management System ("REALMS") in 2017.

71.     Neither system tracked project management fees against budgets for individual projects.

72.     Additionally, **neither** system supported submission of project management invoices; the GCO completed the tracking of project management invoices.

73.     The GCO performed Project Compliance Coordinator duties, which included tracking individual project budgets, providing general oversight, and submission and interaction with Citi's automated systems, REMS, and REALMS. *Amendment 1* at App. F § 1.12.

74.     The Cost Manager issued monthly cost reports for all projects which were reviewed by MGAC and the GCO.

75.     The GCO tracked and processed each invoice from MGAC.

76.     Prior to the award of the RFP to MGAC in August 2016, Defendant Citi neither tracked project management fees by project, nor capitalized project management fees, per the GCO.

77.     Starting in or around November 2017, the GCO entered all project management fees into a "Fee Monitoring Tool" (an excel workbook).[3] During this process, the GCO gathered all fees associated with management positions and apportioned those fees across all active projects.

78.     This process created a myriad of issues, most importantly with budgeting and fee apportionment, because neither were accurately reflected.[4]

79.     The aforementioned process remained in place until March 2018, when MGAC began to distribute management time prior to submission of the final invoice to both Citi and the GCO.

## IV. MGAC AND CITI'S ENGAGEMENT

### A. MGAC Commences Labor on the Projects

80.     During the transition period of August 17 through September 27, 2016, detailed in Work Order 1, Citi failed to provide the necessary immediate access to Citi's systems to MGAC to commence work on the projects.

81.     Both Work Orders 1 and 2 stated that access was necessary for performance of services.

82.     In fact, Citi did not provide access to their systems until December 2016, well into the time period detailed in Work Order 2, over four months into the Projects as a whole. Defendant Citi provided access on a rolling, individual basis to MGAC employees staffed on the Projects.

---

[3] The Fee Monitoring Tool, implemented by Citi on or around November 2017, failed to accurately capture all expenditures and available funds. Additionally, it failed to assess each individual project budget or scope, and, instead, distributed the project management fees evenly across all projects.

[4] The inputting of information into the Fee Monitoring Tool consumed a great deal of time. As a result, MGAC waited weeks to have their invoices reflected in the Fee Monitoring Tool. MGAC did not participate in the fee apportionment process described. Once the invoices finally populated into the Fee Monitoring Tool, MGAC reviewed and corrected all errors, which, again, took a considerable amount of time. In turn, the expenditure of time spent on reviewing the results of the Fee Monitoring Tool delayed progress in the Projects.

83.     Nevertheless, MGAC worked on the Projects throughout the entire time period where Defendant Citi failed to provide system access, thus, performing their obligations under the Agreement.

84.     Defendant Citi requested that MGAC meet with MGAC's predecessor to evaluate incumbent personnel in order to determine who should be retained and ensure a smooth transition.

85.     Despite MGAC's immediate efforts to schedule and ensure a meeting occurred, Defendant Citi did not follow through with arranging a meeting.

86.     Defendant Citi prevented MGAC's ability to coordinate these interactions because Citi required MGAC to work on the same schedule and timeframe as the firm responsible for "Office Projects."

87.     As a result, Defendant Citi did not afford MGAC the appropriate time to properly evaluate staff which caused MGAC to operate without appropriate transition documentation or knowledge and created additional work for MGAC at the commencement of the engagement.

88.     For projects that did not fall under the predecessor firm's scope of responsibility, specifically the project at Thirty-Fourth Street (34th) and Seventh Avenue (7th) in New York, New York, Defendant Citi failed to provide any project documentation or information to allow MGAC to engage with the projects. Citi also prevented assignment of an MGAC project manager until late November 2016, and again failed to provide project files and documentation on the project.

89.     Additionally, Defendant Citi did not provide any contact information for a firm that previously engaged on the work until early 2017.

90.     The Agreement remained silent on how project management fees should be allocated to projects and did not require that project management fees needed to be charged to an individual project within the Projects in order to process the MGAC invoice.

91.     Despite Citi's numerous failures to furnish timely, necessary information and access, MGAC operated under valid Work Orders and Purchase Orders, as per the Agreement.

92.     Furthermore, despite procedures in place with the GCO, neither Citi nor the GCO provided any notice to MGAC regarding disputes, issues with fees billed to Citi, or with fees that the GCO allocated to individual projects.[5]

93.     At the first status meeting between Defendant Citi and Plaintiff MGAC in December 2016, Citi voiced discontent with MGAC's performance, much to the surprise of MGAC, who plunged into the project with over a dozen resources and quickly engaged in projects, despite only receiving systems access days prior to the status meeting.[6]

### B. Citi Fails to Remit Timely Payment for Invoices: August 2016 through August 2017

94.     Citi sporadically paid invoices from the beginning of the engagement with MGAC. In fact, Citi made the first payment to MGAC for services on May 1, 2017, a full nine months after the commencement of services in August 2016.

95.     Throughout the contract period, MGAC submitted all invoices in accordance with instructions issued by Citi and the GCO.

96.     Additionally, Plaintiff MGAC complied with every request of both Defendant Citi and the GCO to revise and resubmit invoices.

97.     The sixty (60) day repayment period for invoices, with the thirty (30) day aspirational goal, detailed in the MSA, never materialized. *MSA* at § 8.5. Citi failed to repay invoices in the aforementioned time period.

---

[5] In fact, capitalizing project management fees did not become a topic of discussion until later in the engagement, specifically, August 2017, when Citi cancelled projects and needed to "write-off" project related costs, as well as project management fees.

[6] Defendant Citi failed provide an agenda, format, or content to review in advance of the meeting (which occurred via telephone due to a snowstorm, thus preventing the Parties from conducting a face to face meeting), resulting in a one-sided conversation.

98.     Indeed, *Defendant Citi typically operated seven figures in arrears* during the length of the engagement with MGAC.

99.     MGAC submitted invoice SI-1377 on November 21, 2016, for the lump sum of Transition Phase project management services in the amount of $298,524.67, as outlined in Work Order 1, which the GCO subsequently recommended for payment on December 21, 2016.

100.     Defendant Citi failed to remit payment for the Work Order 1 invoice within sixty (60) days in accordance with the Agreement.

101.     Instead, Citi did not pay the November invoice until May 1, 2017.

102.     This was the first payment MGAC received from Citi. In fact, Jeanie Choi-Kang ("Ms. Choi-Kang") (a Project Director who also participated in the entire RFP process, departed Citi in 2017, and subsequently returned) informed MGAC that a large portion of this delay was because Ms. Dorfman did not understand the internal approval process at Citi to process the invoices.

103.     Defendant Citi similarly failed to timely remit payment for *nineteen* (19) MGAC invoices. Details of these invoices are attached hereto as **Exhibit A**.

104.     In June 2017, Defendant Citi and the GCO requested that MGAC modify and resubmit its labor and expense invoices to reallocate labor across individual projects to allow the GCO to process them.

105.     MGAC complied with this request in a good faith effort and transmitted multiple iterations of invoices and explanations.[7]

106.     Extending this gesture of good faith, MGAC continued to revise and resubmit the invoices noted in **Exhibit A** at the GCO and Defendant Citi's direction.

---

[7] In some instances, Plaintiff MGAC even went so far as to separate invoices into multiple submissions in order to comply with requests from Defendant Citi and the GCO.

107.     During this period from June 2017 through November 2017, Defendant Citi and the GCO repeatedly confirmed that invoices were being processed.

108.     At no time during this period did Defendant Citi provide any indication that they disputed the invoices or would not remit payment accordingly.

## C. MGAC Highlights Citi's Shortcomings in August 21, 2017 Status Meeting

109.     Citi and MGAC met on August 21, 2017 for the East Coast Retail Mid-Year Review status meeting.

110.     Prior to this meeting, Citi had cancelled numerous status meetings with MGAC and failed to uphold the promise made in the Amended Agreement to meet every six months to review staffing and quarterly to review performance.

111.     MGAC prepared a presentation to call into focus Defendant Citi's shortcomings, to seek a solution for a more harmonious engagement.

112.     The presentation highlighted the challenges MGAC worked through on the Projects, including, but not limited to, turnover of Defendant Citi's internal team members, lack of system access, invoicing process, the lack of a program director, Citi's document management across multiple sites, and lack of design standards.

113.     Additionally, MGAC emphasized teamwork across all involved Parties, including the GCO and Cost Manager, and sought to help improve the processes and communication.

114.     Several individuals attended this meeting from both Citi and MGAC. Mr. Anderson, Steve Hay ("Mr. Hay"), and Ms. Eisenhower participated for MGAC. Ms. Dorfman, Mr. Jonathan Turner (GCO), Mr. Reginald Pretto (Mr. Pretto), Ms. Tomomi Marzan, and Ms. Rachel Zaifert participated for Citi.

115.    Ms. Dorfman admitted to the shortcomings of Defendant Citi. She expressed her resolve to rectify them moving forward.

116.    The Parties committed to meet face to face monthly.

**D. Defendant Citi Approves All Reimbursable Expense Invoices Prior to November 2, 2017**

117.    On September 7, 2017, shortly after the meeting, Ms. Eisenhower and Mr. Hay of MGAC worked with Mr. Pretto and Jonathan Turner ("Mr. Turner") of Citi to focus on processing and resubmitting invoices. Discussions between Mr. Turner, Mr. Pretto, Mr. Hay, Ms. Eisenhower, and others continued from September 2017 through November 2017.

118.    In or around October 2017, the GCO created a fee monitoring tool, as detailed above.

119.    This marked the first occurrence that MGAC received a tracking tool that including information on project budgets and funding from Citi that they could verify against their expenditures and approved fees.

120.    *On November 2, 2017, the GCO informed MGAC that all prior submitted reimbursable expense invoices had been approved and were ready to be processed.*

121.    Mr. Turner acknowledged the lack of timely payments on Citi's behalf on November 3, 2017 when he noted that he would try to speed up the process but could not guarantee it.

122.    These invoices remained unpaid beyond the required sixty (60) day period.

**E. November 4, 2017 Status Meeting and Cancellation of Potential New Projects, Which MGAC Expended Resources to Explore Viability at Citi's Request**

123.    The Parties held a status meeting in New York on November 4, 2017.

124.    Ms. Dorfman acknowledged both at the meeting, and in a subsequent email, that the outstanding invoices, which included $930,674.13 for project management services, ***again,*** would be "immediately paid by Citi."

125.    Additionally, Ms. Dorfman requested MGAC's action regarding approximately $400,000 for work completed by multiple vendors to explore the viability of new projects[8] that Defendant Citi erroneously alleged did not receive pre-approval or should not be paid by Citi.

126.    Blindsided by needing to deal with an issue that MGAC did not create, MGAC reminded Defendant Citi that MGAC requested additional funding to explore the viability of these new projects in June 2017.

127.    Citi confirmed that due to internal process restrictions they could not accommodate additional "pre-funding" for these projects. Ms. Dorfman stated she had no options given the situation and needed MGAC to fix it.

128.    Yet again in a gesture of good faith, in a subsequent email on November 20, 2017, Mr. Hay asserted that MGAC would work with the GCO and Defendant Citi to review all "write-off" costs, which would include reduce outstanding Purchase Orders to offset any of these funds.

129.    After the reconciliation, Mr. Hay disbursed additional credits on behalf of MGAC for project management fees so that the total write-off would not exceed the approved funding.

130.    The aforementioned Fee Monitoring Tool, developed and implemented in October 2017, failed to capture all necessary information, namely, any approved pre-funding expenditures

---

[8] Defendant Citi used this "pre-funding" or "scope agreement" process as a way to explore the viability of a project. Areas examined include due diligence, investigation, test fits, and other preliminary design services. Typically, Citi would limit expenditures to $100,000 for this request to eliminate multiple approvals required within Citi for funds in excess of $100,000. In keeping with this $100,000 threshold, Citi would typically approve additional "pre-funding" to further support these efforts when necessary.

to support project due diligence and project initiation.[9] Therefore, due to Citi's own internal process failure, Citi failed to capture the approximately $400,000 noted above. Following the meeting in August 2017, Plaintiff MGAC and Defendant Citi agreed to meet on a monthly basis to address the stated deficiencies within the program.

131.    Additionally, MGAC proposed several process improvements and staffing changes to the MGAC team. These staffing changes intended to remove personnel and reduce the management team engaged, as well as the number of project managers. This proposal focused on a core team of MGAC project managers to support the projected workload.[10]

**F. Citi Again Fails to Remit Payment for 2017 and**
**Winter/Spring 2018 Invoices, if Even Paid at All, in a Timely Manner**

132.    Citi failed to remit payment for approximately *twenty-four* (24) more invoices from 2017 and the winter and spring of 2018. The details of these invoices are attached hereto as **Exhibit B**.

133.    Beginning in June 2017, Defendant Citi stopped tracking and processing MGAC invoices on a monthly basis.

134.    Given the sizable balance of unpaid invoices, Citi and the GCO frequently re-packaged the approved fees for payment. This process resulted in MGAC listing all outstanding invoices on a single summary page and providing a single dollar amount at the bottom of the summary page for Citi to process and approve.

135.    As a result, Citi and the GCO failed to maintain any accounting of which 2017 invoices were being paid and which invoices were being unpaid.

---

[9] The GCO fee monitoring tool, an excel spread sheet, did not recognize this funding because it could not be easily exported from Citi's various real estate management systems and online tools. As a result, the GCO could not accurately aggregate the approved funding per each project
[10] During this meeting, MGAC also introduced Mr. Tom Ryan to Defendant Citi as the New York regional leader with decades of experience on similar programs for New York based financial services companies.

136.    Throughout this process, *Citi failed to provide MGAC with any documentation regarding a formal dispute of the invoices.*

137.    Citi approved the first group of outstanding 2017 invoices at the November 4, 2017 meeting. The total approved amounted to $930,674.13.

138.    MGAC received a partial payment on January 2, 2018 in the amount of $875,113.40.

139.    MGAC received email confirmation on May 8, 2018 from Ms. Choi-Kang that the January 2018 and February 22, 2018 invoices had been approved. Defendant Citi further confirmed this in writing on June 11, 2018, again demonstrating Citi's failure to pay invoices in a timely manner.

140.    On March 9, 2018, MGAC received Citi's first payment for reimbursable expenses in the amount of $55,560.73. This included a partial balance of 2017 payment for services performed, which Citi approved in January 2018. Defendant Citi also failed to adhere to MSA by failing to remit payment for reimbursable expenses in a timely manner, pursuant to § 8.4.1 of the MSA. MGAC did not receive payment until approximately nineteen (19) months from the commencement of engagement and two months after Citi formally approved the payment.

141.    MGAC received partial payment for 2017 invoices, noted in **Exhibit A** and **Exhibit B**, in the amount of $906,280.41 on April 5, 2018.

142.    Again, Citi failed to remit payment in a timely manner, pursuant to the Agreement.

143.    Once again, in an effort of good faith, MGAC resubmitted invoices for outstanding reimbursable expenses on April 11, 2018. Both Citi and the GCO reassured MGAC that Citi would remit payment for this invoice speedily. This invoice remains outstanding.

144.     Once again, Citi failed to remit payment to MGAC for the following invoices submitted from April through June 2018:

a.      Invoice No. SI-4830, submitted by MGAC on April 16, 2018 for reimbursable expenses incurred in March 2018 in the amount of $3,373.57, of which $787.57 remains outstanding;

b.      Invoice No. SI-4841, submitted by MGAC on April 17, 2018, for project management services performed in March 2018 in the amount of $187,321.02, of which $29,679.96 remains outstanding;

c.      Invoice No. SI-5019, submitted by MGAC on May 23, 2018 for payment of project management services performed in April 2018 in the amount of $159,733.21, of which $8,975.55 remains outstanding; and

d.      Invoice No. SI-5194, submitted by MGAC on June 12, 2018 for reimbursable expenses incurred in May 2018, in the amount of $3,582.36, for which Citi remitted a partial payment of $2,122.20 on September 5, 2018, and $1,460.16 remains outstanding.

145.     The GCO confirmed via email on May 8, 2018 that $64,367.07 of the reimbursable expense invoices had been processed and approved.

146.     However, Citi failed to remit payment to MGAC, and this amount remains outstanding.

147.     After MGAC transmitted its outstanding balance to Citi's General Counsel on July 19, 2018, Citi paid a portion of the April 17, 2018 invoice on August 30, 2018.

148.     Fees in the amount of $38,655.51 from those noted above remain outstanding.

### G. Citi Fails to Maintain the Relationship with MGAC and Uphold Their Obligations Under the Agreement

149.    Defendant Citi cancelled several status meetings with MGAC that the Parties had agreed to participate in. Many of these cancellations occurred less than 24 hours prior to the scheduled meeting. Despite MGAC's efforts, the meetings often did not get rescheduled.

150.    In addition to the frequent requests from MGAC to set up regular leadership meetings with Citi, the Agreement required a staffing review every six months and updated project projections from Citi on a monthly basis when the Parties would review staffing, project assignments, etc.

151.    Despite MGAC's efforts to coordinate these meetings and have these discussions on staffing, they did not occur.

152.    In September 2017, to comply with the Agreement, MGAC prepared a Work Order 2 Amendment and potential Work Order 3 to provide the annual forecasted fees and staffing for the upcoming year of the contract period.

153.    Despite MGAC's repeated efforts[11], these never materialized, because Defendant Citi did not provide feedback or work to execute the amendment required.

### H. Citi Creates Several Issues Regarding Staffing, Despite MGAC's Effort

154.    MGAC prepared and issued a revised Organization Chart and proposed staffing changes, which MGAC emailed to Defendant Citi on November 20, 2017, to reflect the discussed changes at the November 2017 status meeting, and to align the MGAC team with Citi's projected 2018 workload.

---

[11] MGAC reviewed the staffing plan with Citi and the GCO, resubmitted these documents, and Mr. Pretto presented the documents to Ms. Dorfman on the same day. MGAC updated these documents again due to Citi's failure to approve initially.

155.    Citi and MGAC engaged in substantive discussions regarding the proposed changed. Ms. Choi Kang engaged in these discussions on behalf of Citi upon her return.

156.    As a result, MGAC proposed a Transition Plan to Ms. Choi-Kang and Mr. Pretto on February 2, 2018. The Transition Plan focused on a series of staffing changes to be implemented over the course of February through May of 2018.

157.    In February 2018, in keeping with the proposed changes in the Transition Plan, MGAC presented Mr. Nick Priscoe ("Mr. Priscoe") to Citi as a new resource and proposed Mr. Priscoe for the NYC based Regional Manager position.

158.    With this submission, MGAC proposed that during periods of reduced work volume, Mr. Priscoe could also run projects.

159.    Ms. Choi-Kang and Mr. Pretto approved Mr. Priscoe as a resource and sent internal communication on February 28, 2018 to inform other Parties of Mr. Priscoe's start as a "senior project manager/regional manager."

160.    Ms. Choi-Kang presented this Transition Plan to Ms. Dorfman, however, she never approved the Transition Plan, and thus, it never materialized.

161.    Ms. Choi-Kang approved Mr. Priscoe at the rate of $178.50 per hour. However, Defendant Citi later disputed this initially approved amount and demanded Mr. Priscoe's rate be reduced to $157.26 per hour.

### I. Citi Demands Credits from MGAC

162.    In February 2018, Ms. Choi-Kang, with the GCO presented an amount of credits to MGAC that Citi required for 2017 fees.

163.   Defendant Citi calculated these credits to address Citi's own shortcomings with proper apportionment of project management fees. Specifically, Citi sought to use these credits to address a number of costs that Citi wrongly did not capitalize or charge to projects.

164.   These credits would remove the internal accounting issues that Defendant Citi and the GCO had created, specifically, due to Citi's own deficient Fee Monitoring Tool.

165.   Ms. Choi-Kang made it clear Citi required MGAC to award these credits, if MGAC wanted to continue on with the account and working with Citi.

166.   MGAC, committed to the relationship and the Project, included these mandatory credits on the February 2018 project management fee invoice, which MGAC submitted on March 27, 2018.

### J. Citi Demands Additional Detail for Previously Approved Expenses

167.   The GCO requested additional back up detail for the outstanding 2017 and 2016 expenses that had been approved by Citi Real Estate on March 20, 2018.

168.   Despite MGAC's prior submission of invoices with supporting receipts, and Citi's subsequent approval, the GCO stated that finance sought "receipt support." Citi again required MGAC to compile specific receipts for submission.

### K. Citi Fails to Maintain the Relationship, Despite MGAC's Efforts to Fully Perform

169.   On April 3, 2018, MGAC followed up on "gearing ratios" and staff assignment to support the active project workload.

170.   In a subsequent email on April 3, 2018, MGAC verified that this staffing was appropriate given the current project approval status stating that additional resources would not be required until the second or third quarter of 2018.

171.    Given the current workload, MGAC did not feel additional resources were required and adding them would create an additional expense that was not necessary until projects were initiated and approved.

172.    Ms. Choi-Kang responded on April 5, 2018, with a request for additional project managers, aggressively stating that "we [Citi] need them now."

173.    On April 6, 2018, Ms. Choi-Kang and Mr. Hay conversed via telephone about the program and near-term needs.

174.    Both sides spoke positively and had a productive conversation.

175.    Ms. Choi-Kang reiterated her concern about additional resources needed in New York, New York. Ms. Choi-Kang also stated that she did not approve Mr. Priscoe to operate as the Regional Manager.

176.    Mr. Hay reconfirmed that MGAC expected Mr. Priscoe to facilitate and perform oversight functions before the new projects being contemplated were approved and commenced.

177.    Ms. Choi-Kang confirmed that she understood the approach.

178.    During the call, Ms. Choi-Kang shared that Ms. Dorfman did not want Mr. Hay or Ms. Rimlinger to transition off the account. Per Ms. Choi-Kang, "I don't know what you did but she loves you."

179.    Mr. Hay informed Ms. Choi-Kang that no one would leave the account, and instead change roles. The goal was to address the comment that the MGAC team is not New York based by providing New York based team members reporting up through the MGAC leadership team in Washington D.C.

180.    During this meeting Mr. Hay and Ms. Choi-Kang discussed all of the other open items holding things back, including the GCO, Mr. Pretto, Ms. Dorfman, contract structure, etc.

26

*L. Citi Allocates Projects Intended for MGAC to a Competitor*

181.    Mr. Hay received notice from Ms. Choi-Kang that the "pipeline" projects would be allocated to a competitor and not to MGAC.

182.    These included projects that, just weeks prior, Citi requested MGAC initiate the approval process for, which required MGAC to expend time and energy. Ms. Choi-Kang indicated that someone senior to her made the decision.

*M. Citi Fails to Remit Payment for Approved Invoices*

183.    On May 8, 2018, the GCO provided a summary table of all outstanding invoices and confirmed that Citi, specifically, Ms. Choi-Kang and Mr. Pretto, approved payment for the Transition Expenses, including the balance of outstanding 2017 invoices.

184.    Ms. Choi-Kang also approved the invoices for January and February 2018.

185.    After several rounds of email exchanges during March and April 2018, where Citi continued to cancel monthly meetings, contested reimbursable travel expenses, and prevented MGAC's ability to engage approved resources on projects, Mr. Anderson of MGAC contacted Ms. Dorfman directly on May 8, 2018 to meet with her to sit down and resolve their outstanding issues.

*N. Citi Fails to Meet with MGAC for Status Meetings, Pursuant to the Agreement*

186.    The Parties arranged to meet on May 10, 2018, but given the email exchange on May 7 and 8, 2018, a phone call occurred in lieu of a meeting.

187.    Mr. Anderson highlighted that Defendant Citi and Plaintiff MGAC were contractually bound by the Agreement to meet every six months to establish the level of support Citi anticipated and needed from MGAC.

188.    Additionally, Mr. Anderson noted that after the August 2017 status meeting, MGAC committed to meeting with Citi on a monthly basis, but Citi failed to participate.

189.    Defendant Citi cancelled the two monthly status meetings that Mr. Anderson personally scheduled.

190.    On or around May 10, 2018, Mr. Anderson and Ms. Dorfman discussed via telephone the outstanding invoices, broken commitment for new work, and Ms. Dorfman's refusal to recognize MGAC's added New York City based resources. The two resolved to meet in person later in May 2018.

### O. Citi Reverses Course on Prior Approval of Mr. Priscoe

191.    On May 15, 2018, Ms. Choi-Kang provided comments on Mr. Priscoe stating that he was not a fit.

192.    This was completely contradictory to Ms. Choi-Kang's immediate approval of Mr. Priscoe, urgency to have Mr. Priscoe begin work on the account, and statement that Mr. Priscoe should have come worked for her directly when she asked just two months earlier.

### P. May 2018 Status Meeting: Citi Wrongly Disputes Previously Agreed Upon Fees and Expenses

193.    On or around May 29, 2018, Citi, the GCO, and MGAC again met face to face to discussing the outstanding invoices and other broken agreements from Citi.

194.    During the May 29, 2018 meeting, Defendant Citi provided MGAC with a chart identifying a list of fees and expenses Citi purportedly disputed.

195.    Defendant Citi did not provide this chart in advance.

196.    Additionally, Defendant Citi did not provide a formal written notice of dispute or detailed backup to substantiate the fees and expenses included in the table.

197.    Following receipt of the chart on May 29, 2018, MGAC requested further information from the GCO via email on June 1, 2018 to substantiate Citi's reasons for the dispute.

198.    Defendant Citi failed to resolve the alleged invoice despite in good faith, pursuant to MSA § 8.6, because, to date, no such detail has been provided.

199.    Citi disputed four general categories of invoices: (1) Transition Expenses (services and expenses prescribed in Work Order 1), (2) expenses pursuant to Work Order 2, (3) services performed on projects allegedly over budget, and (4) project management services performed pursuant to projects with an overline budget.

200.    Defendant Citi previously agreed to pay the Transition Expenses and expenses pursuant to Work Order 2 in or around June 2017, which is why MGAC resubmitted the invoices as requested by Citi and the GCO in July 2017, and again in or around March 2018 when the GCO acknowledged those expenses were mistakenly not included in the Fee Monitoring Tool and should be incorporated as part of the outstanding balance.

### *Q. Post May 2018 Status Meeting Interactions: Citi Continues to Mismanage the Relationship*

201.    After the May 29, 2018 meeting, Plaintiff MGAC learned that Defendant Citi or one of its agents reduced project budgets in Citi's automated systems without approval or without coordinating those budget changes with the project managers, and/or failed to input Citi approved additional funding on over nine projects into the GCO Fee Monitoring Tool.

202.    MGAC also learned that the GCO assigned the incorrect project number in the GCO's Fee Monitoring Tool that amounted to Citi's failure to account and remit payment for over $21,000 of MGAC invoiced fees.

203.    MGAC informed Citi and its GCO of these issues in June 2018 and requested documentation substantiating Citi's position. To date, no such documentation has been provided.

204.    The Agreement did not place a "not to exceed" budget on individual projects.

Instead, the Agreement stated that each project would be invoiced on a timely and material basis. MGAC did not exceed the "not to exceed" values in Work Order 1 and Work Order 2.

205.    Project management fees were not reported or tracked to individual projects prior to MGAC's engagement.

206.    Furthermore, the project management fees were not reported or tracked within Citi's online budget management tools REMS or REALMS.

207.    Despite meeting with MGAC and sending emails to MGAC staff members regarding invoice comments and questions, Citi failed to send a written notice of the disputes, as required by the Agreement. *MSA* at § 8.6.

### R. Citi Terminates the Agreement Without Cause

208.    On June 22, 2018, Ms. Dorfman terminated the Agreement between Citi and MGAC in a letter, pursuant to MSA § 2.2.2 (ii), which provides that Citi may terminate the Agreement "***without cause***, at any time in its sole discretion by providing 60 days' prior written notice." *MSA* at § 2.2.2 (ii) (emphasis added).

### S. Post-Termination: Defendant Citi Again Fails to Remit Payment

209.    After termination of the Agreement, Defendant Citi failed to remit payment for the following invoices submitted by MGAC as follows:

   a.    July 12, 2018 (Invoice No. SI-5393 EXP) in the amount of $1,688.30 for June 2018 reimbursable expenses, which remains outstanding in its entirety; and

   b.    August 15, 2018 invoice for July 2018 reimbursable expenses in the amount of $47.50, which remains outstanding in its entirety.

210.    Due to Defendant Citi's failure to pay MGAC the outstanding invoices in a timely manner, MGAC provided Citi with a Notice of Breach and Demand to Cure on July 19, 2018 and demanded that City cure the breach by remitting payment, per MSA § 2.2.1.

211.    MGAC received partial payment for fees believed to be from March, April, May, and June of 2018, as well as partial payment for March 2018 expenses in the amount of $541,666.61.

212.    However, the specific months are unknown because Citi never provided MGAC with any confirmation or documentation stating which fees/invoices were being paid.

213.    On September 4, 2018, MGAC received payment from Defendant Citi for partial payment of 2017, January and February 2018 fees, January and February 2018 expenses, and full payment of April 2018 expenses, in the amount of $348,377.47.

214.    Defendant Citi yet again failed to make these payments in a timely manner in accordance with the terms of Agreement.

215.    The following day, September 5, 2018, MGAC received partial payment of 2017 and May 2018 expenses in the amount of $32,931.09.

216.    Again, Defendant Citi did not make payment in a timely manner in accordance with the terms of the Agreement.

217.    MGAC last received payment from Defendant Citi for full payment of August 2018 reimbursable expenses and partial payment of January 2018 reimbursable expenses in the amount of $4,378.53.

218.    An outstanding balance remains in the amount of $487,657.57 for project management services rendered, and reimbursable expenses incurred by MGAC during their engagement with Citi.

219.    Defendant Citi has failed to pay this outstanding amount for services performed pursuant to the Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
*(Breach of Contract)*

220.    Plaintiff MGAC repeats and re-alleges each and every allegation above, with the same force and effect as if fully set forth herein.

221.    Pursuant to New York law, to prevail on a breach of contract claim, a plaintiff must prove that (a) a contract existed, (b) a party performed pursuant to the contract, (c) the other party breached the contract, and (d) the breach resulted in damages. *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.,* 112 F. Supp. 3d 83, 97 (S.D.N.Y. 2015) (internal citations omitted).

222.    The MSA, Work Order 1, Work Order 2, and Amendment 1 to the MSA, collectively known as the Agreement, are valid, executed, and enforceable legal contracts, binding on both MGAC and Defendant Citi.

223.    Pursuant to the terms of the Parties' valid and enforceable Agreement, MGAC agreed to provide project management services for the East Coast Retail projects for Defendant Citi. Defendant Citi, through its agent, employee Ms. Dorfman, agreed to compensate MGAC for the services provided in accordance with the agreed upon fees in the table of rates.

224.    Additionally, Defendant Citi agreed to reimburse MGAC for reasonable expenses incurred in conjunction with Work Order 1 and Work Order 2.

225.    MGAC performed and fully complied with its obligations and performed under the Parties' Agreement until Ms. Dorfman, on behalf of Defendant Citi, terminated the Agreement.

226.    Despite repeated and due demand, Defendant Citi has failed and refused to pay MGAC the sum of $487,657.57 for the professional services provided to Defendant Citi pursuant to the Parties' Agreement.

227.    By reason of the foregoing, Defendant Citi has breached its contract with MGAC, and MGAC has been damaged in an amount no less than $487,657.57.

228.    Plaintiff therefore demands judgment in an amount no less than $487,657.57, plus prejudgment interest, attorneys' fees, and any additional fees the court deems just and proper.

### AS AND FOR A SECOND CAUSE OF ACTION
*(Quantum Meruit)*

229.    Plaintiff MGAC repeats and re-alleges each and every allegation hereinabove, with the same force and effect as if fully set forth herein.

230.    To recover in quantum meruit, plaintiff must demonstrate (i) that plaintiff performed the services in good faith, (ii) that the other party accepted plaintiff's services, (iii) that plaintiff expected to be compensated for the aforementioned services, and (iv) the reasonable value of the services. *J.T. Magen & Co., Inc. v. Allen Edmonds Corp.,* 268 F. Supp. 3d 481, 486 (S.D.N.Y. 2017) (internal citations omitted).

231.    If this court finds that the Parties do not have a valid and enforceable contract, Defendant Citi should be obligated to pay MGAC for the fair and reasonable value of such services under the principle of quantum meruit.

232.    Defendant Citi engaged and requested services from MGAC and agreed to pay MGAC for the performance of these services.

233.    Relying on Citi's promises, MGAC performed the project management services in good faith and expected to be compensated accordingly by Defendant Citi.

234.    Defendant Citi accepted MGAC's project management services and received the benefit of MGAC's services from September 2017 through June 2018.

235.    Defendant Citi has failed to pay MGAC for the full, reasonable, and fair value of the services MGAC rendered for Citi's benefit.

33

236.     The fair and reasonable value of the unpaid services MGAC performed for Defendant Citi is $487,657.57.

237.     Citi has refused to pay MGAC the fair and reasonable value for its services, despite MGAC's due demands for payment.

238.     Equity and good conscience dictate that Citi compensate Plaintiff MGAC for the project management services rendered.

239.     Plaintiff has been damaged in the amount of at least $487,657.57.

240.     Plaintiff therefore demands judgment in an amount to be determined at trial, but not less than $487,657.57 together with prejudgment interest, attorney's fees, and any additional fees the court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Breach of the Implied Covenant of Good Faith and Fair Dealing)*

241.     Plaintiff MGAC repeats and re-alleges each and every allegation hereinabove, with the same force and effect as if fully set forth herein.

242.     The duty of good faith and fair dealing is implicit in every contact under New York law. *Hadami, S.A. v. Xerox Corp.,* 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017).

243.     In order to succeed in a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must demonstrate a duty existed, the other party breached that duty, causation, and that damages resulted. *Id.*

244.     Defendant Citi entered into the Agreement with MGAC and agreed to abide by the terms of the Agreement.

245.     The MSA, Work Order 1, Work Order 2, and Amendment 1 to the MSA, collectively known as the Agreement, are valid, executed, and enforceable legal contracts, binding on both MGAC and Defendant Citi.

246.    Pursuant to the terms of the Parties' valid and enforceable Agreement, MGAC agreed to provide project management services for the East Coast Retail projects for Defendant Citi. Defendant Citi agreed to compensate MGAC for the services provided in accordance with the agreed upon fees in the table of rates.

247.    MGAC performed and fully complied with its obligations and performed under the Parties' Agreement until Ms. Dorfman, on behalf of Defendant Citi, terminated the Agreement.

248.    Citi violated its obligations under the Agreement by failing to provide MGAC with access to its systems within a reasonable amount of time upon MGAC's commencement of work on the Projects.

249.    Additionally, Citi violated the Agreement by failing to meet with MGAC regularly to discuss upcoming projects and to adjust staffing appropriately every six months.

250.    Citi further violated its obligations under the Agreement by failing to amend Work Order 2 with a new annual not to exceed fee for project management services required beyond the first-year term of the Agreement.

251.    Furthermore, Citi failed to uphold their contractual obligations under the Agreement when they repeatedly did not remit payment for invoices within the required sixty (60) days.

252.    Citi also did not engage in good faith when City committed to pay a certain amount for Mr. Priscoe's project management services, then subsequently demanded a reduced rate for the previously agreed upon services.

253.    Additionally, any of Citi's invoice disputes were not made in good faith. Citi advanced superfluous and unsubstantiated invoice disputes well after the payment period deadlines.

254.    As a direct and proximate cause of Defendant Citi's breach, MGAC suffered harm and sustained damages.

255.    Despite repeated and due demand, Defendant Citi has failed and refused to pay MGAC the sum of $487,657.57 for the professional services provided to Defendant Citi pursuant to the Parties' Agreement.

256.    Plaintiff therefore demands judgment in an amount to be determined at trial, but no less than $487,657.57. Defendant Citi is liable to MGAC for the amount of these damages, attorneys' fees, plus prejudgment interest thereon.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*(Account Stated)*

257.    Plaintiff MGAC repeats and re-alleges each and every allegation hereinabove, with the same force and effect as if fully set forth herein.

258.    To recover for an account stated, plaintiff must demonstrate that (i) they presented an account, (ii) the other party, the debtor, accepted that account as correct, and (iii) the other party, the debtor, promised to pay the amount stated. *Abbas Corp. (PVT) v. Michael Aziz Oriental Rugs, Inc.,* 820 F. Supp. 2d 549, 552 (S.D.N.Y. 2011) (internal citations omitted).

259.    MGAC transmitted the invoices and stated accounts to Defendant Citi between November 2017 and September 2018 for services performed and expenses incurred in accordance with the Agreement.

260.    Defendant Citi accepted and retained these invoices and either did not object to the correctness of the invoices within a reasonable period of time and/or agreed that the invoices were correct and proper.

261.    Additionally, Defendant Citi agreed to process and pay the invoices, regardless of dispute or error.

262.     Upon such accounts stated, Defendant Citi is due to owe and pay MGAC the sum of $487,657.57.

263.     Plaintiff therefore demands judgment in an amount to be determined at trial, but no less than $487,657.57, any additional amounts the court deems just and equitable, plus attorney's fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Unjust Enrichment)*

264.     Plaintiff MGAC repeats and re-alleges each and every allegation hereinabove, with the same force and effect as if fully set forth herein.

265.     In order to succeed in a claim for unjust enrichment, plaintiff must demonstrate that (i) the other party was indeed enriched, (ii) the enrichment came at plaintiff's expense, (iii) equity and good conscience permits plaintiff to retain what is sought to be recovered. *Cohen v. BMW Investments L.P.,* 144 F. Supp. 3d 492, 500 (S.D.N.Y. 2015), *aff'd*, 668 F. App'x 373 (2d Cir. 2016) (internal citation omitted).

266.     Defendant Citi knowingly accepted and benefitted from MGAC's project management services.

267.     MGAC performed the project management services in good faith and anticipated receiving full value in return, pursuant to the Agreement.

268.     Defendant Citi failed to transmit proper payment for project management services rendered by MGAC, to which MGAC is entitled under the Agreement.

269.     Defendant Citi has been unjustly enriched by the MGAC's services.

270.     Equity and good conscience require Plaintiff MGAC to recover.

271.     As a result of Defendant Citi's unjust enrichment, MGAC has been harmed and suffered damages in the amount of uncompensated services rendered.

272.    Plaintiff therefore demands judgment in an amount to be determined at trial, but no less than $487,657.57, and any additional amounts the court deems just and equitable, plus attorney's fees.

### AS AND FOR A SIXTH CAUSE OF ACTION
*(Fraud)*

273.    Plaintiff MGAC repeats and re-alleges each and every allegation hereinabove, with the same force and effect as if fully set forth herein.

274.    To recover for fraud, it must be demonstrated that (i) the other party, the defendant, made a material false representation, (ii) the defendant intended to defraud the plaintiff, (iii) plaintiff reasonably relied upon this representation, and (iv) plaintiff endured damages as a result of their reliance. *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.,* 112 F. Supp. 3d 83, 105 (S.D.N.Y. 2015).

275.    Defendant Citi made false misrepresentations to MGAC by promising additional project awards, approving additional resources, assigning projects under the current Agreement, and promising to pay invoices in a timely manner.

276.    Additionally, Defendant Citi approved Mr. Priscoe's approved rate of $178.50 per hour, without the intention to ever remit payment for said amount.

277.    Defendant Citi made these false representations to coerce credits from MGAC to offset internal accounting issues to Citi that Citi created entirely on their own to avoid any negative reactions from internal Citi personnel as a result of their mismanagement of the account and Agreement.

278.    Defendant Citi knew that these representations were false when stated to MGAC.

279.    Plaintiff MGAC reasonably relied upon these false representations throughout the period of the Agreement.

280.     As a direct and proximate result of Defendant Citi's deceptive misrepresentations, MGAC did not receive payment for the project management services rendered or the projects promised to be awarded to MGAC by Defendant Citi, resulting in a substantial loss of business. Additionally, due to Citi's demand for Mr. Priscoe's reduced hourly rate, MGAC incurred damages of $12,276.72.

281.     Defendant Citi is liable to MGAC for these damages in an amount to be determined at trial, of no less than the total dollar amount of the remaining outstanding fees and the balance of Mr. Priscoe's agreed upon hourly rate, totaling $499,934.29, and any additional amounts the court deems just and equitable, plus attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff MGAC respectfully requests that this Court enter judgment against Defendant Citi and in favor of Plaintiff on each cause of action and an award of compensatory and consequential damages as follows:

(i)      on the first cause of action, for breach of contract, an amount no less than $487,657.57, plus prejudgment interest, and attorneys' fees;

(ii)     on the second cause of action, for quantum meruit, for an amount of no less than $487,657.57, plus prejudgment interest and attorneys' fees;

(iii)    on the third cause of action, for breach of implied covenant of good faith and fair dealing, for an amount of no less than $487,657.57, plus prejudgment interest and attorneys' fees;

(iv)     on the fourth cause of action, for accounts stated, for an amount of no less than $487,657.57, plus prejudgment interest and attorneys' fees;

(v)     on the fifth cause of action, unjust enrichment, for an amount of no less than $487,657.57, plus prejudgment interest and attorneys' fees;

(vi)    on the sixth cause of action, fraud, for an amount of no less than $487,657.57 and the price differential of Mr. Priscoe's reduced hourly rate in the amount of $12,276.72, plus prejudgment interest and attorneys' fees; and

(vii)   such other and further relief that this court deems just and proper.

## <u>JURY DEMAND</u>

MGAC hereby demands a trial by jury on all issues triable to a jury in this case.

**Dated: February 20, 2020**
**New York, New York**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*
*Mark G. Anderson Consultants, Inc.*

By: */s/ Andrew T. Miltenberg*
**Andrew T. Miltenberg, Esq. (Bar No. AM7006)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**

**Regina M. Federico, Esq.** *(pro hac vice pending)*
**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2127**
**rfederico@nmllplaw.com**